UNITED STATES (BARNES v.). See Case No. 16,929.

## Case No. 14,524.

UNITED STATES v. BARNEY et al.

[5 Blatchf. 294;[1] 3 Int. Rev. Rec. 46.]

Circuit Court, S. D. New York. Feb. 6, 1866.

FEDERAL COURTS—CRIMINAL JURISDICTION—FORGERY—BOND—PRECINCTS OF CUSTOM HOUSE.

1. The federal courts cannot resort to the common law as a source of criminal jurisdiction, and cannot try any offences except such as are in some form prohibited by the constitution or by act of congress.

[Cited in U. S. v. Coppersmith, 4 Fed. 205.]

2. The crime of forgery, denounced in the first and second causes of the 1st section of the act of March 3d, 1823 (3 Stat. 771). is confined to instruments designed to obtain money from the United States.

[Cited in U. S. v. Lawrence, Case No. 15,572; U. S. v. Albert. 45 Fed. 556; U. S. v. Moore, 60 Fed. 739.]

[1] [Reported by Hon. Samuel Blatchford, District Judge, and here reprinted by permission.]

3. An indictment for uttering, within the precincts of the custom house in the city of New York, a false and fraudulent bond purporting to be given to the United States under the 61st section of the internal revenue act of June 30, 1864 (13 Stat. 245), relating to the exportation of distilled spirits, cannot be sustained under the said 1st section of the act of March 3d, 1823.

4. Nor can an indictment for forging such bond within such precincts, be sustained under the 3d section of the act of March 3d, 1825 (4 Stat. 115). That act is confined to offences committed in places. the sites whereof had been ceded to, and were under the jurisdiction of, the United States, at the time of its enactment. The case of U. S. v. Paul, 6 Pet. [31 U. S.] 141, cited and applied.

[Cited in Fitch v. Newberry, 1 Doug. (Mich.) 1.]

This was a motion to quash an indictment [against William Chase Barney, Bentham Fabian, and Reginald Chauncey].

Samuel G. Courtney, Dist. Atty., and John Sedgwick, for the United States.

Benedict, Burr & Benedict and Benjamin F. Tracy, for defendant Barney.

Edwin James Dunphy, for other defendants.

SHIPMAN, District Judge. The defendants stand indicted for the crime of forging and uttering a certain false and fraudulent bond, within the precincts of the custom house in the city of New York. The bond purports to be given to the United States in pursuance of regulations established by the secretary of the treasury, under the authority of that part of the 61st section of the internal revenue act, approved June 30th, 1864 (13 Stat. 245), which relates to the exportation of distilled spirits, &c. The amount of the bond is $5,234. The conditions relate to the exportation of a quantity of alcohol, alleged therein to be about to be exported from New York to Havre, and require that certificates. and other proofs required by the treasury regulations, of the landing of the article at the latter port, shall be produced to the proper officer, within one year from the date of the bond, and that the article shall not be relanded at any port or place within the United States. The bond is to be void on the performance of the conditions, otherwise. to remain in force. The government claims to have conclusive proof that the bond was forged and fraudulent, and that it was made and uttered by the defendants for the purpose of defrauding the United States. The grand jury have indicted them, and now, before plea, they move to quash the indictment, upon various grounds.

In order to properly notice the questions raised, it will be well here to refer to the two principal features of the indictment, and the particular laws upon which it is founded. The indictment has two counts; the first for forging the bond, and the second for uttering it. The first count is founded upon the 3d section of the crimes act of March 3d, 1825 (4 Stat. 115), in connection with a certain law, or laws. of the state of New York,

which were in force in that state at the date of the passage of that act. The second count is founded upon the 1st section of the act of March 3d, 1823 (3 Stat. 771). This section relates, among other things, to the forging, false making and uttering of certain instruments, with intent to defraud the United States. It will be more convenient to first consider the points raised on the motion touching the second count.

It is insisted that the 1st section of the act of 1823 has no relation whatever to the forgery, or uttering, of a forged instrument of the character of the one in question. If this point is well taken, then the second count charges no offence punishable by the courts of the United States, and must, therefore, fall. It is now settled law, universally acted upon by those courts, that they cannot resort to the common law as a source of criminal jurisdiction. However that body of jurisprudence may furnish the federal courts with rules of procedure, definition, and construction, those tribunals have no power to try any offences, except such as are, in some form, prohibited by the constitution, or by act of congress.

The section upon which the second count is founded, is in the following words: "If any person or persons shall falsely make, alter, forge, or counterfeit, or cause or procure to be falsely made, altered, forged or counterfeited, or willingly aid or assist in the false making, altering, forging or counterfeiting, any deed, power of attorney, order, certificate, receipt, or other writing, for the purpose of obtaining or receiving, or of enabling any other person or persons, either directly or indirectly, to obtain or receive, from the United States, or any of their officers or agents, any sum, or sums of money, or shall utter or publish as true, or cause to be uttered or published as true, any such false, forged, altered, or counterfeited deed, power of attorney, order, certificate, receipt, or other writing as aforesaid, with intent to defraud the United States, knowing the same to be false, altered, forged, or counterfeited, or shall transmit to, or present at, or cause or procure to be transmitted to, or presented at, any office or officer of the government of the United States, any deed, power of attorney, order, certificate, receipt, or other writing, in support of, or in relation to, any account or claim, with intent to defraud the United States, knowing the same to be false, altered, forged, or counterfeited, every such person shall be deemed and adjudged guilty of felony, and, being thereof duly convicted, shall be sentenced to be imprisoned and kept at hard labor, for a period not less than one year nor more than ten years, or shall be imprisoned not exceeding five years, and fined not exceeding one thousand dollars." This section may be properly divided into three parts. The first refers to the false making, forging, or altering of any writing, for the purpose of obtaining any money of the United States; the second, to the uttering of any such false, forged, or altered writing, with intent to defraud the United States; and the third, to the presentation at, or transmission to, any office or officer of the United States, of any false, forged, or altered writing, in support of, or in relation to, any account or claim, with intent to defraud the United States. The first branch does not count in express words upon a guilty knowledge, or an intent to defraud the United States, in the forger, for the very obvious reason, that the fabrication of the instrument for the purpose of obtaining money of the United States necessarily implies both. No person could do the act prohibited without both a guilty knowledge and an intent to defraud the government. The second branch of the section expressly counts upon both a guilty knowledge and a guilty intent to defraud the United States, because, one might possibly utter as true, by passing to another, an instrument which had been originally framed to procure money from the government, knowing its character, with a guilty intent to defraud the person to whom it was passed. The circumstances might be such as to exclude the idea that the passer had any intent or expectation that the United States would be defrauded, but only that the individual receiving the false writing would be cheated. This might occur when the false writing had already been rejected by the government, or where the money sought to be obtained had already been paid. This guilty intent would be reached by the state law. The object of this, as well as of many of the criminal statutes of the United States, is to punish frauds on the government, and not frauds on individuals. But if, with knowledge of the false character of the writing, a person should utter it, with intent to defraud the government, then, and not until then, all the elements of a crime against the United States would be embraced in the act of uttering. It became necessary, therefore, in framing the act, to supply, by express words, the indispensable features of the crime of uttering, which that of forging necessarily implied. This explains the reason why the phraseology of the second part of the section is more full, in descriptive terms, than that of the first part. The terms "for the purpose of obtaining or receiving * * * any sum or sums of money," are descriptive of the character of the instrument, as well as of the intent of the fabricator. The tenor of the instrument and its relation to the end in view, must be, in some degree, in harmony with the object which the offender seeks to attain. This is the class of writings with which the first clause of the section deals. It is against the uttering of such writings that the second clause is levelled. The first clause punishes the forging or altering of the same kind of instruments in respect of which the second clause punishes the uttering. Otherwise, the word

"such," in the statute, has no meaning. That it does, however, have a meaning, and was not a clerical error, or a word loosely and inaptly thrown in, is evident on inspecting the third clause of the section. In that clause, the word "such," is dropped, and the transmission of "any" writing in support of, or in relation to, any claim or account, with intent to defraud the United States, knowing the false and forged character of the writing, is made an offence. It makes no difference whether the account or claim is against the United States, or in its favor, and against an individual. The forged or false paper may be for the enhancement or support of a claim against the government, or it may be for the reduction or extinguishment of a claim in its favor against an individual. In either case, if the paper is transmitted with a guilty knowledge and intent, the crime is of the same grade, and liable to the same penalty as an original forgery. The object of the offender might be, not to obtain money, but to avoid the payment of money—acts which, in a highly penal statute, require to be distinguished by plain and unambiguous terms. The word "such" was, therefore, dropped in the third clause of the act, because its use would carry with it the words of the first clause "for the purpose of obtaining or receiving * * * from the United States * * * any sum or sums of money," and thus greatly narrow the scope of the third clause, thereby necessarily leaving unpunished a large class of offences which might be committed by those who were indebted to the government, and who should seek to evade payment by false and forged writings. This would have excluded from the operation of the statute all offences arising out of the transmission of false papers in support of, or in relation to, any claims for land or other property than money. It may be asked —why did not congress provide, in this same act, against the forgery of all this latter class of instruments? It is not easy to answer this question, unless the answer is found in the fact, that the transmission of false papers relating to accounts and claims, where no money was to be obtained, would be more readily detected and proved than the forgery of the same writings. But, whether this query can be answered satisfactorily or not, it is clear, that the crime of forgery is, in this section, confined to instruments designed to obtain money from the United States. This is virtually conceded by the fact, that the indictment in the present case was not placed upon the third branch of the section. Apart, however, from all these considerations, the plainest rules of construction show, that the use of the word "such," in the second clause, and its omission in the third, was intended to make the first and second clauses operate on the same class of writings, and on no others. From these views, it follows, therefore, that the second

count describes no offence which this court is authorized to punish.

We will now consider the first count of the indictment. This is founded on the 3d section of the act of March 3d, 1825, which provides, "that, if any offence shall be committed in any of the places aforesaid, the punishment of which offence is not specially provided for by any law of the United States, such offence shall, upon conviction in any court of the United States having cognizance thereof, be liable to, and receive, the same punishment as the laws of the state in which such fort, dock yard, navy yard, arsenal, armory or magazine, or other place ceded as aforesaid, is situated, provide for the like offence when committed within the body of any county of such state." The terms "in any of the places aforesaid," and "ceded as aforesaid," refer to the 1st and 2d sections of the same act, which provide for the punishment of specific offences against the laws of the United States, when committed in any place or needful building of the United States, the site whereof is ceded to and under the jurisdiction of the United States. A question arising under this 3d section came before the supreme court of the United States, in the case of U. S. v. Paul, 6 Pet. [31 U. S.] 141. The court held, in that case, that the words "the same punishment as the laws of the state in which such fort, &c., ceded as aforesaid, is situated," are to be limited to the laws of the several states in force at the time of the enactment of the statute. Whatever might be the opinion of this court, if the question were now a new one, it is bound by the judgment of the supreme court already cited. That court limited the clause quoted above to the present tense, and confined it to the date of the act. The clause describing the places upon which the law is to operate is also, and emphatically, in the present tense, and, after the most careful consideration, I have been unable to find any rule of construction or reason, which would authorize this court to extend the act, in its reference to places, beyond its scope as applied to the state laws. To do so, would produce singular results. The site of the New York custom house was not ceded to the United States till 1865. Between the passage of the act, to wit, March 3d, 1825, and the date of such cession in 1865, many criminal statutes of New York, which were in force at the first named date, were repealed, and, among them, the very act relied on in this case. This latter act was repealed in 1829. To hold that the act of congress, so far as it refers to places, includes places thereafter to be ceded, and to restrict the words, "laws of the state * * * provide," to such laws as were in force at the passage of the act, would in effect decide that the act of cession by the state of New York, in 1865, operated, proprio vigore, to revive and put in force highly penal statutes of the state, which had long been repealed. I cannot bring my mind to believe that either con-

gress, or the legislature of the state of New York, contemplated any such result. Consequences so surprising and so remote might, and, I think, would arise, that they could not fairly be presumed to have been within the contemplation of either party. If every new deed of cession of a building site to the United States is to revive a criminal code which has been defunct for forty years, strange results might follow. Whipping and the pillory would, in some cases, have to be inflicted, for they were the penalties denounced by some of the state laws in force in 1825, for offences for which the laws of the United States provide no punishment. The United States have only abolished these barbarous relics of a barbarous age in cases where their infliction was provided for by acts of congress. Indeed, I should hesitate long, before deciding that congress intended that the courts should resort to the repealed laws of any state, as a source of criminal jurisdiction.

I have not come to these conclusions without careful consideration. If it is said, that this construction of the 3d section of the act of 1825 is unfortunate, inasmuch as there are many places and buildings, belonging to the United States, the sites whereof have been ceded since the act went into operation, and that, therefore, offences may be committed within such places which cannot be punished under any existing law of the United States, the answer is, that the responsibility for this difficulty does not rest with the judicial department of the government. Courts cannot make, but can only expound and enforce the law. But, a mere glance at the history of the government will show, that this act must, of necessity, be limited in its operation. It cannot extend to states admitted into the Union since March 3d, 1825, because there were no "laws of the state" in force at that time. The state which was not in existence on the 3d of March, 1825, could have no laws upon which this act was to operate. I assume, of course, that the word "state," as used in the 3d section of that act, refers only to a state of the United States; for, if it should be assumed that it was used in a more comprehensive sense, and included any state or body politic which might be thereafter admitted to the Union, then, in case the act should be held to apply to building sites or places ceded to the United States since March 3d, 1825, the federal courts in Florida, Texas, California, and the states carved out of the Louisiana purchase since that date, might have to resort to laws in force in 1825, which were of Spanish, Mexican, or French origin. This would occur, unless they resorted to territorial laws then in force; but, if none were in force, and the old laws of foreign origin still lingered, they would have to enforce such punishments as those latter laws provide.

It follows, therefore, that, inasmuch as the supreme court have declared that the 3d section of the act of 1825 restricts the courts to the laws of the states then in force, the operation of the act must also be restricted to the places which had been ceded at or before that time. This is the logical result of the doctrine laid down in U. S. v. Paul, already cited, and, so long as that case stands, is the only one which can be reached without producing a most singular and incongruous state of things, which, I think, it is not too much to say, congress never intended.

The case of U. S. v. Davis [Case No. 14,930], has been relied on as establishing a precedent for punishing offences not expressly prohibited by act of congress, in places the site whereof has been ceded since March 3d, 1825. But the case of U. S. v. Paul was subsequent. Besides, the point was not raised in the case of U. S. v. Davis [supra], and, therefore, that case is not entitled to very great weight in determining the present motion.

There were several other questions discussed on the argument. One was, whether the 3d section of the act of March 3d, 1825, was not intended only to supply penalties in cases where congress had prohibited acts, but had omitted to prescribe punishment. Another question was, whether the term "laws of the state," referred only to the statute laws, or embraced also the common law, so far as it was in force in the state. Another point was, whether the court could, in any event, resort, for jurisdiction, to a state law after it was repealed. Some of these questions are by no means free from difficulty, but the conclusion to which I have come renders their consideration unnecessary here.

I regret that I am compelled to announce this result. The crime charged in the indictment is a grave one, and I understand that one of the defendants is accused of having committed the act while in the employ of the government in an official position, the duties of which embraced the supervision of bonds of the character of the one alleged to be fraudulent. I regret that the charge cannot be investigated in this court, and the defendants be acquitted if found innocent, and, if guilty, be properly punished. But I am satisfied that this court has no power to try the case, on this indictment, and must, therefore, grant the motion that the indictment be quashed.